# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF UTAH

| | |
|---|---|
| **SOUTHERN UTAH WILDERNESS ALLIANCE,**<br><br>        **Plaintiff,**<br><br>v.<br><br>**UNITED STATES BUREAU OF LAND MANAGEMENT and HARRY BARBER, in his official capacity as Paria River District Manager,**<br><br>        **Defendants.** | **MEMORANDUM DECISION AND ORDER**<br><br>**Case No. 2:20-cv-00539-JCB**<br><br>**Magistrate Judge Jared C. Bennett** |

All parties in this case have consented to Magistrate Judge Jared C. Bennett conducting all proceedings, including entry of final judgment.[1] Before the court is Plaintiff Southern Utah Wilderness Alliance's ("SUWA") Motion for Review of Agency Action[2] pursuant to the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 701 to 706. The court held oral argument on June 7, 2021.[3] Michelle B. White, Stephen H. Bloch, and Trevor J. Lee appeared on behalf of SUWA. Joseph Hosu Kim appeared on behalf of Defendants United States Bureau of Land Management and Harry Barber (together, "BLM"). At the conclusion of the hearing, the court

---

[1] ECF No. 13.

[2] ECF No. 19.

[3] ECF No. 30.

1

took the matter under advisement. After consideration of the parties' briefs, relevant law, and arguments of counsel, the court renders the following Memorandum Decision and Order.

<strong>INTRODUCTION</strong>

This case is about false cognates. A cognate is a word in one language that has a similar sound and the same meaning as a word in another language.[4] By illustration, a cognate allows a native English speaker to confidently rely on the word *perfecto* to say "perfect" in Spanish.

Although cognates can be useful when translating from one language to another, a false cognate creates significant problems. A false cognate is a word in one language that appears similar to a word in another language but has a different meaning. For example, more than a few native English speakers trying to speak Spanish have learned the hard way that the word *embarazada* in Spanish does not mean "embarrassed," it means "pregnant." And many Spanish speakers have felt a little silly when they have used the Spanish superlative *exquisito* (i.e., "exquisite") as a complement for a delicious meal they received from their kind Brazilian host only to learn that in Brazilian Portuguese *exquisito* (i.e., "strange" or "unpleasant") is insulting when used to describe food.[5] Indeed, false cognates have caused considerable mischief in communications for those who are required to shift from one language to another.

BLM used "routine maintenance" and "improvement" from the language of the common law as false cognates in the languages of the APA and the National Environmental Policy Act

---

[4] *Cognate* Oxford English Dictionary (online) (https://www.oed.com/view/Entry/35870?redirectedFrom=cognate#eid) (last visited July 17, 2021).

[5] Antônio Roberto Monteiro Simões, *Pois Não: Brazilian Portuguese Course for Spanish Speakers*, § 0.1.1 (2008).

("NEPA").[6] BLM's use of these false cognates caused it to make a decision that, in the language of the APA, is "arbitrary and capricious."[7] To illustrate why BLM's erroneous use of these false cognates has created arbitrary and capricious action, the court first describes the four different legal languages that BLM must speak when dealing with R.S. 2477 rights of way[8] and then describes how BLM used the false cognates in this case. Finally, the court's legal analysis shows why BLM's false cognates led to arbitrary and capricious agency action.

    A.  The Four Languages

When making decisions about R.S. 2477 rights of way across federal land, BLM must speak four languages: (1) the APA; (2) NEPA; (3) FLPMA; and (4) the common law of easements. Each language's role in this action is summarily described below.

    *1.  Speaking APA*

The APA provides a limited waiver of sovereign immunity that employs a language all its own.[9] In APA-speak, Congress allows the judiciary to review "final agency action"[10] and to

---

[6] 42 U.S.C. §§ 4321 to 4347.

[7] 5 U.S.C. § 706(2)(A).

[8] In the Mining Act of 1866, Congress enacted R.S. 2477, which provides that "the right of way for the construction of highways over public lands, not reserved for public uses is hereby granted." Act of July 26, 1866, ch. 262, § 8, 14 Stat. 251, 253, codified at 43 U.S.C. § 932, repealed by Federal Land Policy Management Act of 1976, Pub.L. No. 94–579 § 706(a), 90 Stat. 2743. Although R.S. 2477 was repealed in 1976 by the Federal Land Policy and Management Act ("FLPMA"), 43 U.S.C. §§ 1701 to 1787, FLPMA required the United States to recognize all "valid existing rights" established before FLPMA's enactment. Pub.L. No. 94–579 § 701(a), 90 Stat. 2743, 2786 (1976).

[9] *High Country Citizens All. v. Clarke*, 454 F.3d 1177, 1181 (10th Cir. 2006) ("The APA serves as a limited waiver of sovereign immunity. . . .").

[10] 5 U.S.C. § 704.

"hold unlawful and set aside" that final agency action if it is "arbitrary, capricious, an abuse of discretion, or <u>otherwise not in accordance with law</u>."[11] This emphasized phrase has special significance because "[t]here is no right to sue for a violation of the APA in the absence of a 'relevant statute' whose violation 'forms the basis for [the] complaint.'"[12] Because "law" under the APA is a "relevant statute," the United States Supreme Court has precluded federal courts from imposing additional requirements upon a federal agency that a "relevant statute" does not require.[13] Thus, when speaking APA in this action, this court will focus on the words: "final agency action" and the origin or source of the "law" necessary to review that final agency action.

### 2. Speaking NEPA and FLPMA

Because the APA allows courts to review the propriety of agency action against a "relevant statute," the APA necessarily requires reviewing courts to become conversationally fluent in the language of the statutes that the agency's final agency action has allegedly violated. Here, SUWA argues that the relevant statutes are NEPA and FLPMA. Both NEPA and FLPMA have rich linguistic traditions themselves. Relevant here, NEPA imposes the duty upon "all agencies of the Federal Government"[14] to prepare a "detailed statement" regarding any "major

---

[11] 5 U.S.C. § 706(2)(A) (emphasis added).

[12] *El Rescate Legal Servs. v. Exec. Office of Immigr. Rev.*, 959 F.2d 742, 753 (9th Cir. 1991) (quoting *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 883 (1990)).

[13] *Vt. Yankee Nuclear Power Corp. v. Nat. Res. Def. Council, Inc.*, 435 U.S. 519, 547-48 (1978) (reversing court of appeals for imposing additional requirements on agency that neither its organic act nor NEPA required it to undertake).

[14] 42 U.S.C. §4332.

Federal actions significantly affecting the quality of the human environment."[15] Because Congress required all federal agencies to become fluent in NEPA, BLM knows that if a proposed action on federal land meets the definition of "major federal action," BLM is required to prepare some type of NEPA study.[16] The NEPA study will take the form of a categorical exclusion, an environmental assessment, or an environmental impact statement.[17] Thus, the phrase "major federal action" is the focus of this court's study of NEPA's unique language.

Whereas Congress required all federal agencies to speak NEPA, Congress made FLPMA the organic language of BLM.[18] Although FLPMA's language covers many topics, the relevant words for this action begin with "Wilderness Study Area"[19] ("WSA"). FLPMA requires BLM to designate WSAs and "to manage [them] . . . so as not to impair the[ir] suitability" until Congress determines whether those WSAs should become Wilderness Areas under the Wilderness Act (i.e., 16 U.S.C. § 1131 to 1134c).[20] To accomplish this, FLPMA also requires BLM to "take any action required to prevent unnecessary or undue degradation of the lands and their resources to afford

---

[15] *Id.* §4332(C).

[16] *Sierra Club v. Hodel*, 848 F.2d 1068, 1089 (10th Cir. 1988) ("The need for NEPA study hinges on the presence of major federal action.") *overruled on other grounds by Village of Los Ranchos De Albuquerque v. Marsh*, 956 F.2d 970, 971 (10th Cir. 1992) (en banc).

[17] *Utah Env't Cong. v. Bosworth*, 443 F.3d 732, 736 (10th Cir. 2006).

[18] *Richardson v. Bureau of Land Mgmt.*, 565 F.3d 683, 689 n.1 (10th Cir. 2009) (stating that FLPMA is BLM's "organic act").

[19] 43 U.S.C. § 1782(a)

[20] 43 U.S.C. § 1782(c).

environmental protection."[21] Additionally, in recognition of the fact that land management acts of decades past may have given non-federal parties certain rights to federal land (e.g., R.S. 2477, the Mining Act of 1872,[22] among others), Congress requires BLM to respect "valid existing rights."[23] Accordingly, the words from the FLPMA vernacular that are particularly relevant here are: WSAs, "unnecessary or undue degradation," and "valid existing rights."

### 3.  Speaking Common Law

As courts have grappled with the meaning of "valid existing rights" under FLPMA, courts have relied on the ancient language of the common law of easements where, as here, the valid existing right at issue is an R.S. 2477 right of way.[24] In *Southern Utah Wilderness Alliance v. BLM* ("*SUWA*"),[25] the United States Court of Appeals for the Tenth Circuit discussed the common law language that BLM and an R.S. 2477-right-of-way-holder must speak to one another regarding the use and enjoyment of the R.S. 2477 right of way.[26] In that case, the court played the role of a language tutor because the county and BLM were not using their words. Instead of talking, the county unilaterally bulldozed a road across federal land as an exercise of

---

[21] *Id.*

[22] 30 U.S.C. § 42 (allowing the United States to issue patents for profitable mining claims).

[23] *Hodel*, 848 F.2d at 1086.

[24] *Id.* at 1086-87 (stating that courts rely on "the common law of easements" regarding R.S. 2477 rights of way).

[25] 425 F.3d 735 (10th Cir. 2005).

[26] *Id.* at 747 (stating that common law principles of easements apply to interaction between BLM and the county relating to activities that the county could perform on its R.S. 2477 right of way).

its purported R.S. 2477 right of way.[27] The court criticized the county's conduct because

"'[b]ulldoze first, talk later' is not a recipe for constructive intergovernmental relations or

intelligent land management."[28] The Tenth Circuit stated that the common law of easements was

the language BLM and the county should speak to each other regarding these rights of way.[29]

The court then emphasized two important words in the common law language: "maintenance"

and "improvement."[30] In fact, the court stated:

> [W]hen the holder of an R.S. 2477 right of way across federal land proposes to
> undertake any <u>improvements</u> in the road along its right of way, beyond mere
> <u>maintenance</u>, it must advise the federal land management agency of that work
> in advance, affording the agency a fair opportunity to carry out its own duties
> to determine whether the proposed improvement is reasonable and necessary in
> light of the traditional uses of the rights of way as of [FLPMA's enactment], to
> study potential effects, and if appropriate, to formulate alternatives that serve to
> protect the lands.[31]

Once the county speaks one of these common law words to BLM, then BLM must assess

whether the county's proposed action is "reasonable and necessary, whether they would impair or

---

[27] *Id.* at 742.

[28] *Id.* at 749.

[29] *Id.* at 747 (stating that under "common law principles governing easements . . . one party cannot serve as the sole judge of scope and extent [of the right of way], or as the sole arbiter of what is 'reasonable and necessary' . . . [a]nd ordinarily . . . no material changes can be made by either party without the other's consent . . . ." (citations omitted)).

[30] This court acknowledges that the definitions that the Tenth Circuit provided for "maintenance" and "improvement" arose from regulations from the National Park Service. *Id.* at 749 (citation omitted). However, the Tenth Circuit recognized that these regulatory definitions were a good restatement of common law duties between land-owning sovereigns. *Id.*

[31] *Id.* at 748 (emphasis added).

degrade the surrounding lands, and whether modifications in the plans should be proposed."[32] Additionally, BLM must consider whether the county's common law words need to be translated into other languages that Congress requires BLM to speak (e.g., FLPMA and NEPA, among others).[33]

To further assist BLM and the county with their common law-speaking abilities, the Tenth Circuit endorsed a definition for both "maintenance" and "construction," which the court said was a synonym of "improvement."[34] Based on the Tenth Circuit's common law language tutorial, BLM created a policy known as Internal Memorandum 2008-175 ("the IM") that defines "improvement" and "maintenance" to guide BLM's conversations with local government entities that seek to perform work on their R.S. 2477 rights of way.[35] This caselaw and policy provide the origins of the common law words "improvement" and "maintenance" that BLM has mistakenly employed as false cognates under the APA and NEPA in the decision that precipitated this case, the history of which is discussed below.

---

[32] *Id.* at 747 ("Unless it knows in advance when right-of-way holders propose to change the width, alignment, configuration, surfacing, or type of roads across federal land, the BLM cannot effectively discharge its responsibilities to determine whether the proposed changes are reasonable and necessary, whether they would impair or degrade the surrounding lands, and whether modifications in the plans should be proposed.").

[33] *See Hodel*, 848 F.2d at 1090-91 (finding that BLM had an obligation under NEPA and FLPMA to evaluate the county's proposal to modify its R.S. 2477 right of way across federal land).

[34] *S. Utah Wilderness All. v. Bureau of Land Mgmt.*, 425 F.3d at 749.

[35] ECF No. 16, Administrative Record ("AR __") 132-36.

B.  BLM's Use of Common Law Words as False Cognates Under the APA and NEPA

Kane County and the State of Utah hold a valid R.S. 2477 right of way to the Skutumpah

Road, which connects Johnson Canyon Road and Cottonwood Road in Kane County, Utah.[36]

Along its 33-mile path, the Skutumpah Road transects Bull Valley Gorge.[37] To cross this gorge,

prior users of the road constructed a primitive dirt bridge whose foundation was an old pickup

truck on top of which rock, timber, and soil were piled.[38] Only a few feet from this bridge is the

Paria-Hackberry WSA.[39] In the spring of 2019, approximately 80% of this bridge collapsed,

which created dangerous conditions and interrupted travel along the Skutumpah Road.[40]

Consequently, in May of 2020, Kane County engaged in its common law consultation with BLM

and proposed to install an "engineered steel bridge" that would be approximately 60 feet long, 24

feet wide, and would have guardrails.[41] Installation of this steel bridge would require:

(1) excavating 150 cubic yards of soil and 11 cubic yards of rock; (2) altering the grade of the

Skutumpah Road on both ends of the bridge; and (3) pouring concrete headwalls to form the

bridge's foundation instead of using an old pickup truck.[42] According to BLM, this new bridge

[36] *Kane County v. United States*, No. 08-CV-315, 2011 WL 2489819, at *8 (D. Utah June 21, 2011).

[37] AR 312.

[38] AR 328.

[39] AR 196.

[40] AR 254.

[41] AR 331-32.

[42] AR 243, 254.

fits "almost entirely within the prior" bridge area because a small portion of fill on the north

corner of the new bridge protrudes outside of the prior disturbed area.[43]

Upon hearing Kane County's common-law-language proposal, BLM sought to determine

whether this proposal was "maintenance" or an "improvement." BLM's engineering review

noted that the new bridge would be "wider th[an] what was there" before, but safe passage on the

bridge would require increased width and, therefore, the proposed new bridge was reasonable.[44]

BLM also asked an interdisciplinary team to review Kane County's proposal and to conduct a

non-NEPA environmental review especially where the construction area was directly adjacent to

a WSA.[45] BLM's intra-team correspondence introduced the proposed new bridge "[a]s a

proposed improvement to an adjudicated R.S. 2477 right-of-way."[46] The team also pointed out

that the 24-foot width of the new bridge was considerably wider than the 15-foot width of the

prior dirt bridge.[47] Given the difference between the new and old bridges, the team

acknowledged that the new bridge would create impacts to visual resources, recreational

experiences, and public viewing.[48] Indeed, the team predicted that "many more people" would

stop "on either side of the bridge, walk out on it, and take photos. It is likely to become a similar

---

[43] ECF No. 21 at 8 (emphasis added; citing AR 329, 333).

[44] AR 322.

[45] AR 292-93, 290 (recognizing that the environmental review is non-NEPA).

[46] AR 293.

[47] AR 291.

[48] AR 290.

attraction . . . as the Hell's Backbone Bridge."[49] These observations accompanied the team's designation of the area as a "High Sensitivity" area for visual resources.[50]

The team assembled a partially completed draft environmental review document in which it made its preliminary findings.[51] Consistent with its initial thoughts, the team's partial environmental review acknowledged that

> [a]s part of the consultation process on a proposed improvement to an R.S. 2477 [right of way], the BLM must assess whether the proposed improvement may adversely affect the surrounding public lands and resources and, if so, whether there are alternatives or modifications to the proposed improvement that would avoid or minimize such impacts.[52]

Although the narrative portion of the draft report is incomplete, BLM attached a table to the draft that contained the team members' conclusions.[53] Among the many conclusions in this table, the team observed that the new bridge "would likely result in an increase in recreational use of the roadway and recreational attractions in the surrounding area" that would be more intense immediately after bridge installation but would dissipate over time.[54] Despite the foregoing, the team stated that the bridge replacement would not impact or impair the adjacent WSA and stated

---

[49] *Id.*

[50] *Id.*

[51] AR 297-317.

[52] AR 301 (emphasis in original omitted).

[53] AR 306-11.

[54] AR 309.

that BLM had "provided a WSA write-up to address public concerns."[55] This "write-up" or other impact analysis on the WSA does not appear in the Administrative Record. Additionally, as to visual resources, BLM proposed changes to the project, which further suggested that the bridge replacement project was an "improvement" according to common law language because,[56] as BLM observed earlier in the report, BLM would provide "modifications" to minimize impacts from the project.[57]

On June 15-16, 2020, some members of the intra-agency team engaged in a two-day conference call with the Department of the Interior's Assistant Secretary for Land and Minerals discussing Kane County's bridge proposal.[58] The day after this two-day conference call, a team member forwarded the incomplete draft environmental review to another BLM manager stating, among other things, that the need for the document "may be moot at this point."[59] BLM never issued a final environmental review document.

Instead of finishing its draft or preparing a final environmental review, BLM issued a memorandum on July 10, 2020, stating that the new bridge was "maintenance" and, therefore, BLM did not have to consult with Kane County over its bridge proposal.[60] BLM concluded that the bridge was "maintenance," according to the word's common law meaning, because it was

---

[55] AR 310.

[56] AR 310-11.

[57] AR 301.

[58] AR 296.

[59] AR 295.

[60] AR 333.

restoring the Skutumpah Road's continuity over Bull Valley Gorge.[61] BLM reasoned that Kane County could not replace the previous dirt bridge because it would be unsafe and the new bridge would be safer.[62] BLM also stated, contrary to the team's findings, that the bridge "is not expected to increase traffic on the Skutumpah Road,"[63] and will not change the character of Kane County's R.S. 2477 right of way.[64] Because BLM concluded the new bridge was maintenance, it was not required to further consult with Kane County.[65]

Upon determining the bridge replacement project was "maintenance," BLM also implicitly decided that the project did not constitute "major federal action" that would necessitate some type of NEPA analysis. In other words, BLM believed that "maintenance" was a cognate for the absence of "major federal action" whereas "improvement" was a cognate for the existence of "major federal action." Consequently, BLM neither prepared a NEPA document (i.e., categorical exclusion, environmental assessment, or environmental impact statement) nor a FLPMA analysis regarding the recreational and visual impacts that BLM preliminarily determined the new bridge would cause or any impacts to the immediately adjacent WSA.

---

[61] *Id.*

[62] *Id.*

[63] *Compare* AR 333 *and* AR 309.

[64] AR 333.

[65] *Id.*

Three days following BLM's "maintenance" decision, Kane County began installing the bridge.[66] The bridge installation is now complete.[67]

A couple of weeks after installation began, SUWA filed this action alleging that BLM's "maintenance" decision was arbitrary and capricious because it violated both NEPA and FLPMA.[68] SUWA did not seek a preliminary injunction, so the case proceeded along the normal course of litigation challenging administrative action under DUCivR 7-4, which requires the parties to follow an appellate-style briefing format.[69]

In its brief, SUWA contended that BLM's decision that the bridge was "maintenance" was arbitrary and capricious because "improvement" was a more appropriate designation and, therefore, BLM had a duty to consult with Kane County.[70] SUWA also contended that BLM violated NEPA by failing to consider the impacts of the bridge project on the adjacent WSA.[71]

BLM responded by arguing that BLM's decision that the new bridge was "maintenance" was not "final agency action" under the APA and, therefore, not subject to judicial review.[72] BLM next argued that even if BLM's decision was final agency action, its "maintenance"

---

[66] ECF No. 19 at 21.

[67] ECF No. 19 at 21; ECF No. 21 at 18.

[68] ECF No. 2 at 12-17.

[69] *See also Olenhouse v. Commodity Credit Corp.*, 42 F.3d 1560, 1580 (10th Cir. 1994) (stating that when reviewing agency action under an arbitrary and capricious standard, "the district court should govern itself by referring to the Federal Rules of Appellate Procedure").

[70] ECF No. 19 at 22, 25-30.

[71] ECF No. 19 at 31-33.

[72] ECF No. 21 at 10-12.

designation was reasonable and, therefore, not arbitrary and capricious.[73] Finally, BLM contended that because its maintenance decision was not agency action, it was relieved of performing any duties under either FLPMA or NEPA.[74]

Prior to oral argument, the court issued an order requesting that the parties address whether this action is moot due to the bridge's completion and whether the common law duty between Kane County and BLM to consult with one another could be enforced under the APA.[75] The court conducted oral argument on June 7, 2021. After reading, listening to, and considering the foregoing, the court determines that BLM engaged in "final agency action" under the APA that was "arbitrary and capricious" because BLM failed to prepare any NEPA or FLPMA analyses as a result of erroneously relying on false cognates.

**ANALYSIS**

## I.   BLM ENGAGED IN FINAL AGENCY ACTION UNDER THE APA.

BLM rendered a "final agency action" in this action, which allows this court to engage in judicial review. Section 702 of the APA provides a right of judicial review for "[a] person suffering legal wrong because of agency action,"[76] and section 704 adds the requirement that the "agency action" be "final"[77] for judicial review to occur. This is more than semantics because

---

[73] ECF No. 21 at 12-17.

[74] ECF No. 21 at 17-18.

[75] ECF No. 29.

[76] 5 U.S.C. § 702.

[77] *Id.* § 704.

establishing "final agency action" is a jurisdictional prerequisite for judicial review under the APA.[78] Even if the court can engage in judicial review of "final agency action," however, Congress authorizes the court to "hold unlawful and set aside" that final agency action only if it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."[79] And, as stated above, "the law" must be predicated upon a "relevant statute."[80] As discussed below, the court concludes that BLM engaged in final agency action, but the only final agency action that the court can set aside as arbitrary and capricious is BLM's failure to conduct NEPA and FLPMA analyses. The court finds that BLM's decision that the bridge installation project was "maintenance" instead of an "improvement" is based on the common law, which is not enforceable through the APA.

    A.   <u>BLM Engaged in Final Agency Action.</u>

BLM engaged in "final agency action" when it determined that the bridge installation was only "maintenance" and, therefore, decided not to conduct any NEPA or FLPMA analysis. To be deemed "final agency action," two conditions "must be satisfied."[81] First, the purported agency decision "'must mark the "consummation" of the agency's decision making process—it must not be of a merely tentative or interlocutory nature.'"[82] Second, the claimed agency action

---

[78] *Utah v. Babbitt*, 137 F.3d 1193, 1203 (10th Cir. 1998).

[79] 5 U.S.C. § 706(2)(A).

[80] *Vt. Yankee Nuclear Power Corp.*, 435 U.S. at 547-48.

[81] *U.S. Army Corps of Eng'rs v. Hawkes Co.*, 136 S.Ct. 1807, 1813 (2016).

[82] *Id.* (quoting *Bennett v. Spear*, 520 U.S. 154, 177-78 (1997)).

"must be one by which rights or obligations have been determined, or from which legal consequences will flow."[83] These conditions are often referred to as the *Bennett* conditions.[84]

Where, as here, an agency's final agency action is determining the status of land, the Supreme Court's decision in *U.S. Army Corps of Engineers v. Hawkes, Co.*, is illustrative. In *Hawkes*, the Army Corps of Engineers made jurisdictional determinations whether the Clean Water Act applied to certain lands.[85] When the Corps issued what it called an "approved jurisdictional determination," the land under review was deemed to be regulated under the Clean Water Act, which was binding for a five-year period on the Corps and the Environmental Protection Agency ("EPA") because both agencies jointly regulate under the Act.[86] Because the "approved jurisdictional determination" was the Corps' final word on the matter, the first *Bennett* condition of finality was easily met.[87]

As to the second *Bennett* finality condition, the Court considered whether legal consequences flowed from the jurisdictional determinations.[88] The Court first examined whether a negative determination of jurisdiction carried legal consequences.[89] The Court concluded that a

---

[83] *Id.* (quoting *Bennett*, 520 U.S. at 178).

[84] *See id.* (identifying two conditions set forth in *Bennett* "that generally must be satisfied for agency action to be 'final' under the APA").

[85] *Id.* at 1811.

[86] *Id.* at 1812.

[87] *Id.* at 1813.

[88] *Id.* at 1814.

[89] *Id.*

negative jurisdictional determination actually had legal consequences because for five years after issuance, the landowner had a safe harbor from Clean Water Act enforcement by either the Corps or the EPA.[90] This safe harbor limited both the landowner's potential liability and who could be a plaintiff against the landowner in an enforcement action.[91] After considering the legal impacts of a negative jurisdictional determination, the Court analyzed the impact of an affirmative jurisdictional determination.[92] The Court found that an affirmative jurisdictional determination deprived the landowner of a five-year safe harbor from Clean Water Act enforcement and warned that if the landowner discharged pollutants onto the property without a permit from the Corps, then the landowner risked significant civil and/or criminal penalties.[93] Therefore, the Court held, even though the Corps could revise these determinations with new information,[94] the jurisdictional determination was "final agency action" under the APA.

BLM's "maintenance" or "improvement" determination is similar to the Corps' jurisdictional determinations. BLM's July 10, 2020 memorandum definitively determined that the bridge installation is "maintenance" because,[95] once issued, BLM neither consulted further with Kane County nor performed any analysis under NEPA or FLPMA. Instead, Kane County commenced bridge construction shortly thereafter. This clearly shows that BLM's maintenance

---

[90] *Id.*

[91] *Id.*

[92] *Id.* at 1814-15.

[93] *Id.* at 1815.

[94] *Id.* at 1814.

[95] *Id.* at 1813.

determination was the agency's last word on two matters: (1) whether the agency had to consult further with Kane County, and (2) whether the agency had to engage in any analysis under NEPA and FLPMA. Thus, BLM's maintenance decision—which rendered two final decisions—clearly meets the first *Bennett* condition of finality.

BLM's maintenance determination meets the second *Bennett* condition, too. As BLM acknowledged in its partially complete draft environmental review, when BLM finds that a proposed county action on an R.S. 2744 right of way is an "improvement," then "BLM must assess whether the proposed improvement may adversely affect the surrounding public lands and resources and, if so, whether there are alternatives or modifications to the proposed improvement that would avoid or minimize such impacts."[96] Additionally, BLM believes that an "improvement" finding necessarily requires environmental review under both NEPA and FLPMA. Thus, when BLM determines a proposed action to be an "improvement" of an R.S. 2477 right of way, legal consequences flow between BLM and the county because BLM will request alternatives and modifications to the proposal, which puts the county on notice that BLM may seek judicial intervention to stop the project if the county's project exceeds what BLM has determined to be reasonable.[97] Legal consequences of an "improvement" decision also appear to flow to BLM because it triggers BLM's duties to prepare NEPA and FLPMA analyses.

---

[96] AR 301 (emphasis in original omitted).

[97] *S. Utah. Wilderness All.*, 425 F.3d at 748 (stating that when BLM and a county disagree about what the county proposes to do on an R.S. 2477 right of way, "the parties may resort to the courts").

Conversely, with a "maintenance" determination, BLM informs the county that BLM sees no problems with the project, the project needs no modification, and BLM will not seek judicial intervention regarding whatever the County has proposed. And BLM believes that a maintenance decision liberates it from performing its NEPA and FLPMA obligations. Thus, a "maintenance" determination gives the county a safe harbor from BLM and, possibly, judicial intervention in the project while freeing BLM of its obligations to perform its statutory duties under NEPA and FLPMA. Accordingly, each determination (i.e., "improvement" or "maintenance") has legal consequences for both BLM and the project proponent, which satisfies the second *Bennett* condition for final agency action.

Despite the foregoing authority, BLM contends that an "improvement" is a cognate for "final agency action" whereas a "maintenance" is a cognate for the "absence of final agency action."[98] This assertion is *exquisito* in the Brazilian Portuguese sense because it ignores the Supreme Court's analysis in *Hawkes*. The *Hawkes* Court reached its final agency action determination after considering the legal consequences of <u>both</u> an affirmative jurisdictional determination and a negative jurisdictional determination.[99] This analytical method is important because the existence of final agency action—and, consequently, judicial review—cannot turn merely on the label that an agency gives to its decision. If this were the case, then the county could propose transforming a narrow R.S. 2477 right of way into an eight-lane highway, and, to avoid judicial review, all BLM would have to do is determine that the expansion is

---

[98] ECF No. 21 at 11-12.

[99] *Hawkes*, 136 S.Ct. at 1814-15.

"maintenance." The determination of "final agency action" is and always has been left to the judiciary, not the federal agency making the decision. To hold otherwise would entrust the keys to judicial review to the agency itself, which has no textual basis in the APA whatsoever.[100] Indeed, when BLM's determinations of "maintenance" and "improvement" are analyzed based on the legal consequences that flow from each, there is little doubt that each determination is final agency action and, therefore, subject to judicial review under the APA.

B.  Although BLM Engaged in Final Agency Action, the Court Can Only Set Aside Final Agency Action that is Contrary to Relevant Statute.

Although BLM's "maintenance/improvement" determination is "final agency action," the court's judicial review has its statutory limits. Recall that BLM's maintenance determination had the effect of: (1) ending consultation with Kane County, and (2) ending any environmental review under NEPA and FLPMA. The first effect is based on common law and, therefore, is not "law" that can be enforced through the APA. The second effect is based on the alleged violation of relevant statutes, which is clearly enforceable under the APA. This court's ability to review each effect through the APA is discussed below.

1.  BLM's Obligation to Consult with the County is not "Law" that Can be Enforced Under the APA.

The decision to end consultation with Kane County is not something that this court can do anything about under the APA. The APA authorizes a court to set aside final agency actions that are "not in accordance with law."[101] Courts have repeatedly and consistently interpreted "not

---

[100] 5 U.S.C. §§ 702, 704, 706.

[101] 5 U.S.C. § 706(2)(A).

in accordance with law" to mean that "[t]here is no right to sue for a violation of the APA in the absence of a 'relevant statute' whose violation 'forms the legal basis for [the] complaint.'"[102] Thus, "the plaintiff must identify a substantive statute or regulation that the agency action had transgressed and establish that the statute or regulation applies to the United States."[103]

When courts say that only statutes and regulations with the force and effect of law are enforceable under the APA, they are serious. In fact, courts have clearly stated that neither agency policy statements nor the common law is "law" that is enforceable through the APA. First, a statement of agency policy is neither "a statute" nor "a regulation" and, therefore, cannot "appl[y] to the United States" because it is not binding upon the agency.[104] Indeed, "[a] binding policy is an oxymoron."[105] Thus, even though IM 2008-175 states the criteria for determining whether a county proposal on an R.S. 2477 right of way is "maintenance" or an "improvement"—and, therefore, whether BLM must consult with the county—that non-binding policy lacks the force and effect of law. Accordingly, that policy is not "law" that Congress has authorized this court to enforce through the APA.

Second, independent of IM 2008-175, BLM's common law duty to consult with Kane County is not enforceable through the APA. Justice Frankfurter once stated that "[t]here is no

---

[102] *El Rescate Legal Servs.*, 959 F.2d at 753 (quoting *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 883 (1990)).

[103] *Preferred Risk Mut. Ins. Co. v. United States*, 86 F.3d 789, 792 (8th Cir. 1996).

[104] *AMREP Corp. v. Fed. Trade Comm'n.*, 768 F.2d 1171, 1178 (10th Cir. 1985)).

[105] *Vietnam Veterans of Am. v. Sec'y of the Navy*, 843 F.2d 528, 537 (D.C. Cir. 1988).

such thing as common law judicial review in the federal courts."[106] Moreover, the Supreme Court made this point quite clearly in *Vermont Yankee*. In *Vermont Yankee*,[107] the United States Court of Appeals for the District of Columbia imposed upon the agency additional procedures that the relevant statute governing the agency did not. The Supreme Court unanimously reversed and chided the D.C. Circuit for "fundamentally misconceiv[ing]" the nature of judicial review.[108] The Court held that "this sort of unwarranted judicial examination of perceived procedural shortcomings of a rulemaking proceeding can do nothing but seriously interfere with that process prescribed by Congress."[109] The Court of Appeals was again corrected for holding that the agency may be required "to develop new procedures to accomplish the innovative task of implementing NEPA through rulemaking."[110] The Court rejoined that "we search in vain for something in NEPA which would mandate such a result."[111] The Court then said:

> In short, nothing in the APA, NEPA, the circumstances of this case, the nature of the issues being considered, past agency practice, or the statutory mandate under which the Commission operates permitted the court to review and overturn the rulemaking proceeding on the basis of the procedural devices employed (or not

---

[106] *Stark v. Wickard*, 321 U.S. 288, 312 (1994) (Frankfurter, J., dissenting); *see also Gros Ventre Tribe v. United States*, 469 F.3d 801, 810 (9th Cir. 2006) (stating in an APA action that "the Tribes cannot allege a common law cause of action for breach of trust that is wholly separate from any statutorily granted right"); *Cobell v. Babbitt*, 91 F. Supp. 2d 1, 28 (D.D.C. 1999) (stating in an APA action that the tribes "cannot state common-law claims for breach of trust against these federal officials . . . .").

[107] 435 U.S. 519 (1978).

[108] *Id.* at 547.

[109] *Id.* at 548.

[110] *Id.* (quotation omitted).

[111] *Id.*

> employed) by the Commission so long as the Commission employed
> at least the <u>statutory</u> minima, a matter about which there is no doubt
> in this case.[112]

In other words, courts cannot impose requirements upon an agency that Congress has not created

through statute or that an agency has not added by issuing binding regulations under rulemaking

authority that Congress has delegated to the agency. Thus, the common law cannot be enforced

against an agency through the APA.

In this action, the consultation obligation between BLM and Kane County is a matter of

common law, which this court cannot enforce through the APA. As a threshold matter, neither

NEPA, FLPMA, nor any other federal statute imposes a duty upon BLM to consult with the

county regarding an R.S. 2477 right of way. Moreover, the Tenth Circuit stated in *SUWA* that a

county's duty to consult with BLM before undertaking improvements on its R.S. 2477 right of

way is derived from "common law principles" or "general principles of the common law of

easements."[113] In fact, at no time in its landmark *SUWA* decision did the Tenth Circuit state that

the consultation duties between the county and BLM arise from any federal statute. The only

time that the Tenth Circuit mentioned federal statutes in *SUWA* was to show that consultation

between BLM and the county needed to occur so that BLM could fulfill its statutory duties,

which include determining whether the proposed project would unnecessarily or unduly degrade

WSAs, among other things.[114] Although the duty to consult is certainly actionable as a matter of

---

[112] *Id.* (emphasis added).

[113] 425 F.3d at 747.

[114] *Id.*

common law between the consulting parties, that duty is not from a source of "law" that Congress authorized courts to enforce through the APA. Thus, the court will not consider whether BLM violated its duty to consult Kane County because the legal origin of that common law duty is not enforceable through the APA.

### 2. BLM's Decision not to Conduct NEPA and FLPMA Analyses is Enforceable Through the APA.

BLM's decision not to prepare analyses under NEPA and FLPMA is enforceable through the APA because that decision implicated congressionally imposed statutory duties. "[W]here an agency concludes that NEPA does not apply to its actions at all, the agency's decision is not entitled to the deference that courts must accord to the agency's interpretation of its governing statute and is instead a question of law, subject to de novo review."[115] Similarly, courts also enforce BLM's FLPMA obligations through the APA.[116] Therefore, this court's APA review of BLM's final agency action will be against the language of NEPA and FLPMA and not the language of the common law.

## II. BLM ACTED ARBITRARILY AND CAPRICIOUSLY BY NOT UNDERTAKING ITS NEPA AND FLPMA OBLIGATIONS.

BLM acted arbitrarily and capriciously by refusing to perform any NEPA or FLPMA analysis. The trigger for BLM's compliance with either NEPA or FLPMA is not whether Kane County's proposal was an "improvement" or "maintenance." In fact, neither NEPA nor FLPMA

---

[115] *Sierra Club v. U.S. Army Corps of Eng'rs*, 990 F. Supp. 2d 9, 22-23 (D.D.C. 2013) (quotations omitted).

[116] *See, e.g., W. Watersheds Project v. Kraayenbrink*, 632 F.3d 472, 477 (9th Cir. 2011) (remanding to district court where it "failed to consider Plaintiffs' FLPMA claims" in an APA action).

mentions those words much less give them the legal power to trigger BLM's compliance duties under either statute. Instead, the trigger for complying with NEPA is "major federal action,"[117] and the trigger for complying with FLPMA in this action is preventing "unnecessary or undue degradation" to the adjacent WSA.[118] Thus, "maintenance" or "improvement" are false cognates for NEPA and FLPMA compliance. Consequently, the court determines whether the project at issue here was a "major federal action" under NEPA and whether BLM fulfilled its FLPMA duty to analyze whether the project would cause "unnecessary or undue degradation" to the WSA.

When considering the applicable NEPA and FLPMA standards, the Tenth Circuit's decision in *Sierra Club v. Hodel* is controlling. In *Hodel*, a county wanted to improve a segment of an R.S. 2477 right of way from "an essentially one-lane dirt road into an improved two-land gravel road."[119] A portion of the proposed project was adjacent to a WSA, but other portions were not.[120] After affirming that "[t]he need for NEPA study hinges on the presence of major federal action,"[121] the court stated that "[t]he touchstone of major federal action . . . is an agency's authority to influence significant nonfederal activity."[122] The court found that "monitoring activities to prevent the County from exceeding its authority to improve or constructing outside its right-of-way do not amount to authority to regulate or approve

---

[117] 42 U.S.C. § 4332(C); *Hodel*, 848 F.2d at 1090.

[118] 43 U.S.C. § 1782(c); *Hodel*, 848 F.2d at 1090.

[119] 848 F.2d at 1073.

[120] *Id.*

[121] *Id.* at 1089.

[122] *Id.*

significant aspects of the [R.S. 2477] construction."[123] Thus, when BLM is "dealing with

defining boundaries of . . . existing rights-of-way" that do not affect WSAs, then "BLM has no

power to designate alternatives or deny nonfederal actors a course of action."[124] Consequently,

for road projects bereft of a WSA, BLM can do very little to alter the project, and, therefore,

there is no major federal action.[125]

However, the court found major federal action where a WSA was involved because of

"BLM's duty under FLPMA [43 U.S.C. § 1782(c)] and its regulations[] to prevent unnecessary

degradation of WSAs from these changes in the right-of-way."[126] The proximity of the project to

the WSA "injects an element of federal control for required action that elevates this situation to

one of major federal action."[127] Where, as here, the proposed R.S. 2477 project "will impact a

WSA, the agency has the duty under FLPMA . . . to determine whether there are less degrading

alternatives, and it has the responsibility to impose an alternative it deems less degrading upon

---

[123] *Id.* at 1090.

[124] *Id.*

[125] *Id.* at 1091 ("There is also no merit in the amicus curiae's argument that a finding of major federal action in this case would force BLM to 'federalize' all local road projects, regardless of size or impact. First, the authority exists only under FLPMA § 603 and hence applies only to road projects that impact WSAs.").

[126] *Id.* at 1090.

[127] *Id.*

the nonfederal actor."[128] That obligation under FLPMA is sufficient to "invoke NEPA requirements"[129] because BLM's ability to control the outcome amounts to major federal action.

The Administrative Record here shows that BLM knew of impacts from the bridge installation project but provided no evidence showing that the WSA would escape those impacts, which violates both FLPMA and NEPA.[130] Although BLM's incomplete draft environmental review contains only two sentences in an attached table stating that the bridge project will not impact the WSA,[131] the evidence in the Administrative Record does not support that two-sentence assertion. The court has been unable to find any notes or analyses anywhere stating that the construction and use of the proposed bridge replacement will not impact the adjacent WSA. Instead, the evidence in the record notes that the new bridge will garner more recreational users, traffic,[132] and affect visual resources.[133] This bridge is mere feet from the WSA. Based on these preliminary observations, BLM was going to make design suggestions for the bridge to avoid some of these impacts.[134] This shows that the bridge installation project would have impacts, and

---

[128] *Id.* 1090-91.

[129] *Id.* at 1091.

[130] *Id.* at 1090-91 ("Thus, when a proposed road improvement will impact a WSA the agency has a duty under FLPMA . . . and the regulation to determine whether there are less degrading alternatives, and it has the responsibility to impose an alternative it deems less degrading upon the nonfederal actor.").

[131] AR 310.

[132] AR 290, 309.

[133] AR 310-11.

[134] AR 310-11 (stating that "the project should incorporate design features targeted at meeting [visual resource] objectives. Examples of how this might be achieved include the use of

BLM did not adequately determine whether the adjacent WSA would be included in those project impacts. Thus, BLM did not perform its FLPMA or NEPA duties when it should have, which is the definition of "arbitrary and capricious" action.[135]

Nevertheless, BLM argues that *Hodel* is inapposite because that case dealt with an "improvement" instead of mere "maintenance." Once again, BLM mistakenly uses both terms as false cognates in the languages of FLPMA and NEPA. Although the *Hodel* court used the term "improvement" when describing the county project in that case,[136] it did not use that term in the same fashion that BLM now uses it. Indeed, BLM's definition of "improvement" did not receive Tenth Circuit imprimatur until many years after. Moreover, the *Hodel* court's standard for triggering BLM's NEPA and FLPMA obligations was not tied to a project being an "improvement," but whether the project would "impact" a WSA.[137] Determining whether the project will impact a WSA is the first analytical step that BLM must undertake in its FLPMA analysis. If there is an impact, then FLPMA requires BLM to "determine whether there are less degrading alternatives," which it must impose on the nonfederal actor if necessary, which triggers NEPA.[138] Thus, the relevant standard here is "impact" to adjacent WSAs not whether the

---

colored/dyed concrete and other construction materials, incorporation of stamps or texturing methods for concrete abutments and surfaces, avoidance of reflective/shiny/metallic construction materials, painting of bridge materials, and incorporation of a driving surface that utilizes or mimics natural-appearing materials").

[135] *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).

[136] *Hodel*, 848 F.2d at 1076 (stating that "[a] court can measure whether the improvement of the Burr Trail will . . . cause 'unnecessary or undue degradation'").

[137] *Id.* at 1090-91.

[138] *Id.*

proposed R.S. 2477 project constitutes "maintenance" or "improvement." Because the

Administrative Record shows various impacts to the area mere feet away from an adjacent WSA,

and because BLM did not provide any analysis under FLPMA and NEPA addressing those

impacts to the adjacent WSA, BLM's action is arbitrary and capricious under the APA.

## ORDER

Based on the foregoing, SUWA's Motion for Review of Agency Action[139] is GRANTED.

Although the court has determined that BLM acted arbitrarily and capriciously, the court

ORDERS briefing relating solely to the remedy that the court should impose. Both parties shall

file their respective briefs on or before August 30, 2021. The parties' briefs will be limited to 10

total pages inclusive of the caption, any introduction, and argument.[140]

---

[139] ECF No. 19.

[140] Although neither party briefed Article III jurisdiction, the court requested oral argument on whether this action was moot because of the court's independent obligation to determine its subject matter jurisdiction. ECF No. 29. At the June 7th hearing, BLM argued that this action should be dismissed because SUWA lacked standing when this action was filed and, to a lesser degree, that this action was moot. The court finds that SUWA has standing and that this action is not moot. To have standing, SUWA would have to show, among other things, that it would suffer an injury to a legally protected interest because of BLM's action. *Lujan v. Def. of Wildlife*, 504 U.S. 555, 560 (1992). "The relevant showing for purposes of Article III standing, however, is not injury to the environment but injury to the plaintiff." *Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*, 528 U.S. 167, 181 (2000). "We have held that environmental plaintiffs adequately allege injury in fact when they aver that they use the affected area and are persons for whom the aesthetic and recreational values of the area will be lessened by the challenged activity." *Id.* at 183 (citations and quotations omitted). Here, SUWA has adequately established that it will suffer an injury to a legally protected interest by presenting an affidavit of a SUWA member's use of the Bull Valley Gorge and the activities that she claims will be adversely affected by BLM not engaging in its NEPA and FLPMA responsibilities prior to the bridge replacement project. Although nothing in the Administrative Record shows that the bridge project was completed before SUWA filed suit, even if it was, BLM may be able to seek post-construction alterations to the bridge if its FLPMA and NEPA analyses determine that such alterations are needed to prevent unnecessary or undue degradation of the adjacent WSA. Thus,

DATED July 30, 2021.

BY THE COURT:

_____

JARED C. BENNETT
United States Magistrate Judge

---

SUWA's injury outlasts the installation of the bridge. Not only does SUWA's injury outlast the bridge installation but so do the potential remedies. This court can order BLM to undertake its statutory obligations, and their fulfillment may affect the adjacent WSA. Because this court could still grant real-world relief to SUWA, its claim is not moot despite the fact the bridge has been installed. *Wyoming v. U.S. Dep't of Agric.*, 414 F.3d 1207, 1212 (10th Cir. 2005) (stating that a case is not moot where the court can presently determine the issues in a way that "will have some effect in the real world").

In any event, even if the completion of the bridge installation has rendered this action moot, it falls within an exception to the mootness doctrine. An action is exempted from the mootness doctrine when it is capable of repetition yet evading review. An action is capable of repetition yet evading review where: (1) "the duration of the challenged action is too short to be fully litigated prior" to the offending action being completed; and "(2) there is a reasonable expectation that the same complaining party will be subjected to the same action again." *Chihuahuan Grasslands All. v. Kempthorne*, 545 F.3d 884, 892 (10th Cir. 2008) (quotation and citation omitted). Given that the bridge installation project appears to have been completed within a few weeks of BLM determining that it did not need to engage in FLPMA or NEPA analysis, the duration of the bridge installation was too short to be fully litigated prior to its completion. *See United States v. Seminole Nation*, 321 F.3d 939, 943 (10th Cir. 2002) (holding that a procedure that required a total of 90 days to complete was capable of repetition yet evading review). Also, unlike the withdrawn oil and gas leases in *Chihuahuan Grasslands*, the R.S. 2477 right of way along the Skutumpah Road at issue here will not cease to exist and will be subject to additional road projects that are necessary to operate and maintain that right of way near WSAs that are found along that road. 545 F.3d at 894. Therefore, there is a reasonable expectation that BLM will continue to make decisions regarding county road projects that will implicate WSAs, which will impact SUWA's members. Consequently, decisions like the one at issue in this action are capable of repetition yet evading review, which exempts them from the mootness doctrine.